Citation Nr: 1536760 
Decision Date: 08/27/15 Archive Date: 09/04/15

DOCKET NO. 11-08 467 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Providence, Rhode Island


THE ISSUES

1. Entitlement to service connection for a low back disability.

2. Entitlement to service connection for residuals of head injury.

3. Entitlement to service connection for residuals of a right hand contusion.

4. Entitlement to service connection for a left knee disability.

5. Entitlement to service connection for a right ankle disability.

6. Entitlement to a rating higher than 10 percent for a right shoulder disability.

7. Entitlement to a rating higher than 20 percent for a left shoulder disability. 

8. Entitlement to a rating higher than 0 percent for bilateral hearing loss.

9. Entitlement to a rating higher than 20 percent for narcolepsy/ sleep paralysis disorder.

10. Entitlement to special monthly compensation (SMC) based on the need of aid and attendance by another person.


REPRESENTATION

Appellant represented by: Michael J. Kelley, Attorney


WITNESS AT HEARING ON APPEAL

Appellant


ATTORNEY FOR THE BOARD

Sarah Richmond, Counsel

INTRODUCTION

The Veteran had active military service from September 2000 to October 2002, and January 2005 to April 2009. He had a period of active duty for training from February 1999 to June 1999.

This matter comes to the Board of Veterans' Appeals (Board) from rating decisions of the Department of Veterans Affairs (VA) Regional Office (RO) in Providence, Rhode Island. In December 2009 the RO, in pertinent part, granted service connection for disabilities of the shoulders and bilateral hearing loss, assigning 0 percent ratings, effective April 28, 2009. The RO also denied service connection for a back disorder, right ankle disorder, right hand disorder, and residuals of traumatic brain injury finding that new and material evidence had not been received to reopen the claims. The RO, in pertinent part, denied service connection for a left knee disability in February 2011 finding that new and material evidence had not been submitted to reopen the claim. The RO also granted increased ratings of 10 percent for the right shoulder and 20 percent for the left shoulder, effective April 28, 2009. As the Veteran has indicated that he is not satisfied with the ratings for his shoulders, these claims are still before the Board. AB v. Brown, 6 Vet. App. 35 (1993).

In April 2013, the Veteran testified before the undersigned Veterans Law Judge at a Board hearing at the RO. 

The Board granted service connection for narcolepsy in a June 2014 decision. After the RO implemented the Board's grant of service connection in a June 2014 rating decision and assigned a 20 percent rating for narcolepsy/ sleep paralysis, effective April 28, 2009, the Veteran appealed the rating assigned. On his January 2015 VA Form 9 he requested a Board videoconference hearing with respect to this appeal.

The Veteran also appealed a November 2013 decision that denied entitlement to special monthly compensation based on the need of aid and attendance of another person and/ or housebound benefits, and requested a Board videoconference hearing on his April 2014 VA Form 9. The RO granted entitlement to special monthly compensation based on being housebound in June 2014 and noted that if this grant satisfied his appeal he should respond within 30 days; otherwise the appeal for special monthly compensation based on the need of aid and attendance of another person would continue. The Veteran did not respond; so the appeal for special monthly compensation based on aid and attendance continues.

In June 2014, the Board also reopened the service connection claims for disabilities of the back, right ankle, right hand, and left knee, as well as residuals of traumatic brain injury, finding that new and material evidence had been received to reopen the claims. The claims were remanded on the merits. The case is now returned for appellate review.

The issues of entitlement to an initial rating higher than 20 percent for narcolepsy/ sleep paralysis, and special monthly compensation based on the need of aid and attendance of another person are addressed in the REMAND portion of the decision below and are REMANDED to the AOJ.


FINDINGS OF FACT

1. The Veteran failed to report for January 2015 VA examinations scheduled in conjunction with his initial rating claims for bilateral shoulder disabilities and hearing loss, and service connection claims for a back disability, right hand disability, right ankle disability, left knee disability, and residuals of traumatic brain injury; nor has he presented good cause for his failure to report for the examinations.

2. The Veteran was diagnosed as having a traumatic brain injury in service and post-service records confirm the continued presence of a traumatic brain injury.

3. The evidence of record is insufficient to establish service connection for a back disability, right hand/finger disability, right ankle disability, and left knee disability.

4. The Veteran's right shoulder disability is manifested by limitation of motion most severely limited to 135 degrees of flexion and abduction with complaints of pain.

5. The Veteran's left shoulder disability is manifested by limitation of motion most severely limited to 100 degrees of flexion and abduction with instability and complaints of pain.

6. The Veteran's hearing loss is manifested by no more than Level I hearing in both ears. 





CONCLUSIONS OF LAW

1. The criteria for entitlement to service connection for residuals of traumatic brain injury have been met. 38 U.S.C.A. §§ 1110, 5107(b) (West 2014); 38 C.F.R. §§ 3.102, 3.303 (2014).

2. A back disability was not incurred or aggravated in active service. 38 U.S.C.A. §§ 1110, 5107 (West 2014); 38 C.F.R. §§ 3.303, 3.655(b) (2014).

3. A right hand/finger disability was not incurred or aggravated in active service. 38 U.S.C.A. §§ 1110, 5107 (West 2014); 38 C.F.R. §§ 3.303, 3.655(b) (2014).

4. A right ankle disability was not incurred or aggravated in active service. 38 U.S.C.A. §§ 1110, 5107 (West 2014); 38 C.F.R. §§ 3.303, 3.655(b) (2014).

5. A left knee disability was not incurred or aggravated in active service. 38 U.S.C.A. §§ 1110, 5107 (West 2014); 38 C.F.R. §§ 3.303, 3.655(b) (2014).

6. The criteria for a rating higher than 10 percent for a right shoulder disability are not met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.321, 3.655(b), 4.1, 4.7, 4.10, 4.71a, Diagnostic Code (DC) 5024 (2014).

7. The criteria for a rating higher than 20 percent for a left shoulder disability are not met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.321, 3.655(b), 4.1, 4.7, 4.10, 4.71a, Diagnostic Code (DC) 5202 (2014).

8. The criteria for an evaluation in excess of 0 percent for bilateral hearing loss are not met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.321, 3.655(b), 4.85, 4.86, Diagnostic Code 6100 (2014).





REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

I. The Veterans Claims Assistance Act of 2000 (VCAA)

Under the VCAA, when VA receives a complete or substantially complete application for benefits, it must notify the claimant of the information and evidence not of record that is necessary to substantiate a claim, which information and evidence VA will obtain, and which information and evidence the claimant is expected to provide. 38 C.F.R. § 3.159; see also Dingess/Hartman v. Nicholson, 19 Vet. App. 473 (2006). Such notice must include notice that a disability rating and an effective date for the award of benefits will be assigned if there is a favorable disposition of the claim. Id; 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5106, 5107, 5126; 38 C.F.R. §§ 3.159, 3.326; see also Pelegrini v. Principi, 18 Vet. App. 112, 120-21 (2004) (Pelegrini II). 

Prior to initial adjudication of the Veteran's claim, letters dated in June 2006, May 2009, and August 2010 fully satisfied the duty to notify provisions of VCAA. 38 U.S.C.A. § 5103; 38 C.F.R. § 3.159(b)(1); Quartuccio v. Principi, 16 Vet. App. 183, 187 (2002); Pelegrini v. Principi, 18 Vet. App. 112, 120-21 (2004) (Pelegrini II); Dingess v. Nicholson, 19 Vet. App. 473 (2006). 

The Veteran's service treatment records and VA treatment records pertaining to his claims for disability benefits have been obtained and associated with the claims file. The Veteran was examined by VA during the pendency of the appeal in June 2006, July 2006, November 2009, November 2010, and December 2010. The July 2006 and November 2010 examinations were general examinations and did not include any etiology opinions. Of note, the November 2009 VA audio examination described the functional effects of the Veteran's hearing loss disability, pursuant to Martinak v. Nicholson, 21 Vet. App. 447, 455 (2007). Specifically it was noted that the Veteran reported difficulty hearing at a distance and in noisy environments.

VA attempted to schedule the Veteran for additional examinations to address the severity of his bilateral shoulder and hearing loss disabilities and etiology of the claimed disabilities of the back, right ankle, left knee, and right hand/ finger disabilities in October 2009, January 2012, and January 2015 that have been cancelled for his failure to attend or at his request. Most recently, in January 2015, the Veteran called VA and asked VA to cancel his scheduled examinations, as had been requested by his lawyer, and was noncommittal about rescheduling them. The Veteran and his attorney had previously testified at the April 2013 Board hearing that he and the Veteran had not been receiving notices of the scheduled examinations, and requested that a notice letter be sent to both the Veteran and the attorney for the scheduled examinations. 

The burden is on VA to demonstrate that notice was sent to the claimant's last address of record and that the claimant lacked adequate reason or good cause for failing to report for a scheduled examination. Hyson v. Brown, 5 Vet. App. 262, 265 (1993); see also Connolly v. Derwinski, 1 Vet. App. 566 (1991). The Board notes that although the Veteran's claims file does not contain a file copy of an actual notice letters from the VA Medical Center ("VAMC"), per standard VA practice, the Veteran's examination request reports are included in his file. Moreover, based on the communication received from the Veteran in January 2015 that he wanted to cancel his exams per his lawyer's request, the Board deduces that both the Veteran and his lawyer received notice of the January 2015 scheduled examinations. 

The Veteran did not provide any reason for his failure to report to the January 2015 examinations. Under 38 C.F.R. § 3.655(a), when entitlement to a benefit cannot be established without a current VA examination or reexamination and a claimant, without good cause, fails to report for such examination or reexamination, action shall be taken in accordance with 38 C.F.R. § 3.655(b) or (c) as appropriate. Title 38 C.F.R. § 3.655(b) applies to original or reopened claims or claims for increase, while 38 C.F.R. § 3.655(c) applies to running awards, when the issue is continuing entitlement. More specifically, when a claimant fails to report for a medical examination scheduled in conjunction with an original compensation claim, without good cause, the claim shall be rated based on the evidence of record. See 38 C.F.R. § 3.655(b). Examples of good cause include, but are not limited to, the illness or hospitalization of the claimant, or death of an immediate family member. See 38 C.F.R. § 3.655(a) . The United States Court of Appeals for Veterans Claims (Court) has held that "[t]he duty to assist is not always a one-way street. If a veteran wishes help, he cannot passively wait for it in those circumstances where he may or should have information that is essential in obtaining the putative evidence." Wood v. Derwinski, 1 Vet. App. 190, 193 (1991). 

Although the record does not contain a current VA examination to address the initial rating claims for the bilateral shoulder and hearing loss disabilities or the service connection claims for disabilities of the back, right ankle, left knee, or right hand/ finger, the Board will proceed with a decision.

As noted, VA also afforded the Veteran the opportunity to give testimony before the Board in April 2013. The Board hearing focused on the elements necessary to substantiate the claim, and the Veteran and his representative, through his testimony, demonstrated that he had actual knowledge of the elements necessary to substantiate his claim. As such, the Board finds that, consistent with Bryant v. Shinseki, 23 Vet. App. 488 (2010), the Veterans Law Judge complied with the duties set forth in 38 C.F.R. § 3.103(c)(2). 

VA has complied with the notice and assistance requirements and the appellant is not prejudiced by a decision on the claims at this time.

II. Service Connection

Service connection is established where a particular injury or disease resulting in disability was incurred in the line of duty in active military service or, if pre-existing such service, was aggravated during service. 38 U.S.C.A. § 1110; 38 C.F.R. § 3.303(a). Service connection requires competent evidence showing: (1) the existence of a present disability; (2) in-service incurrence or aggravation of a disease or injury; and (3) a causal relationship between the present disability and the disease or injury incurred or aggravated during service. Shedden v. Principi, 381 F.3d 1163, 1167 (Fed. Cir. 2004); see also Caluza v. Brown, 7 Vet. App. 498 (1995). The determination as to whether these requirements are met is based on an analysis of all the evidence of record and the evaluation of its credibility and probative value. Baldwin v. West, 13 Vet. App. 1 (1999); 38 C.F.R. § 3.303(a). 

In determining whether service connection is warranted for a disability, VA is responsible for determining whether the evidence supports the claim or is in relative equipoise, with the claimant prevailing in either event, or whether a preponderance of the evidence is against the claim, in which case the claim is denied. 38 U.S.C.A. § 5107; Gilbert v. Derwinski, 1 Vet. App. 49 (1990). 

A. Traumatic Brain Injury Residuals

The Veteran contends that he has residuals of a traumatic brain injury. The record shows that the Veteran had service in Iraq, earned the Combat Infantryman Badge, and was exposed to mortar blasts. The record also shows, however, that the original head injury took place in July 2002, also during the Veteran's active duty service, when the Veteran was hit in the head with a bottle and hospitalized at Fort Bragg. The only available records for the time of injury include a CT scan of the head performed at Womack Army Hospital in July 2002, which was normal. However, an addendum notes that surgical staples were seen over the right frontoparietal scalp. 

After the Veteran's second period of service, a May 2003 VA examination report shows the Veteran complained of having daily headaches, irritability, and difficulty concentrating, among other problems, which started after suffering a closed head injury in July 2002. He reportedly was hit with a bottle on the right side of his head and suffered a moderate duration of loss of consciousness. He indicated that he was brought to the hospital and stitches were applied. Physical examination in May 2003 showed a long, well-healed scar in the right temporal region. A CAT scan and EEG study was requested but the Veteran was a no show for both studies. The diagnosis included status post closed head injury with concussion. A January 2005 examination report at the Veteran's entry into his last period of service also notes a 3-inch long scar on the right temple/ forehead from old laceration.

A July 2006 VA general examination report (during active duty service) notes that the Veteran reported that his ex-wife hit him on the right side of the head in the temple area with a bottle in July 2002 while serving at Fort Bragg. He noted that he had blood shooting out of the side of his head and was rushed to Womack Army Hospital where he got sutures and staples. He did not recall the details too clearly but he never lost consciousness. He reportedly had an EEG at follow-up and was told he had post-concussive syndrome. He complained of bad headaches, and inability to concentrate. He continued to have headaches, just as severe, but less frequently, five to six times per month.

A May 2008 TBI consult also shows the Veteran reportedly was involved in a custody dispute with his ex-wife and during the altercation was struck in the head in the right temple. He denied loss of consciousness but did feel confused in the aftermath of this event, and also might have had some disruption of memory. He indicated that he underwent EEG testing and was told he had post-concussive syndrome one month later. The Veteran further noted that during airborne training he had some "hard hits" but denied that he struck his head or lost consciousness. During his deployment he indicated that his primary exposure was routine exposure to concussive waves from mortar blasts. He denied any loss or alteration in consciousness associated with the episodes but accurately described the sensation of the wave blast. The Veteran was diagnosed as having a mild traumatic brain injury as a result of the head injury in July 2002, as he met the criteria for alteration of consciousness and memory disruption. The examining clinician further noted that though he was exposed to multiple blasts in Iraq, none of the blasts rose to the level of a mild TBI. 

In March 2008 a neurology consult notes that the Veteran's exposure to mortar blasts also could cause a traumatic brain injury. However a June 2008 TBI consult notes that the blast injuries in service were not severe enough to warrant a TBI and that the only head injury severe enough to result in the present symptoms was the head injury in 2002. 

After service, the Veteran complained on a VA treatment record in December 2010 of having pressure at the front of his forehead that radiated to the back of his skull and left side of his head, and blurriness of vision. However, he denied headaches. He underwent EEG testing in December 2010. The January 2011 EEG lab report noted that the Veteran had a history of multiple blast injuries in Iraq and now had headaches, dizziness, light sensitivity, lack of concentration, and balance issues. The physician noted that overall the findings suggested effects of medication and drowsiness, but that mild underlying left frontotemporal dysfunction accounting for slight asymmetry of slowing was possible. 

VA discharge summaries dated from March 2011 to March 2013 note an Axis III diagnosis of post-concussion syndrome. A January 2012 VA discharge summary shows a secondary diagnosis of headache with a past medical history of traumatic brain injury secondary to mortar concussion, as well as being hit by a beer bottle in 2002. The traumatic brain injury was continued on diagnoses on VA treatment records through December 2014.

As the record shows that the Veteran was diagnosed as having a traumatic brain injury in service and post-service records confirm the continued presence of a traumatic brain injury related to a head injury in service in 2002 and possibly due to mortar blasts during deployment to Iraq, resolving all doubt in the Veteran's favor, service connection for residuals of a traumatic brain injury is warranted. See Groves v. Peake, 524 F.3d 1306 (Fed. Cir. 2008) (Where the record contains both in-service and post-service diagnoses of a chronic disorder, no medical opinion as to etiology is necessary to grant service connection. ); 38 C.F.R. § 3.102.

B. Back, Right Ankle, Left Knee, and Right Hand/ Finger Disabilities

The Veteran seeks service connection for disabilities of the back, right ankle, left knee, and right hand/ finger. As previously noted, he has been scheduled for examinations for his claimed disabilities in October 2009, January 2012, and January 2015 that have been cancelled for his failure to attend or at his request. After the Veteran and his representative testified at the April 2013 Board hearing that neither he, nor the Veteran had been receiving notices of some of these examinations due to the Veteran moving, he was rescheduled for examinations in January 2015. However, email correspondence notes that the Veteran contacted VA by telephone on the date of the scheduled examinations and requested that the examinations be cancelled, per his representative's request; he also reportedly was noncommittal about rescheduling the examinations. 

The service treatment records document treatment for some of the Veteran's claimed disabilities. For instance, the Veteran suffered a contusion injury to his right hand while moving furniture in June 2002 and had pain in the 4th and 5th fingers and hand. After the Veteran's second period of service, a May 2003 x-ray of the right hand showed a slight deformity of the 5th metacarpal most likely related to previous trauma. However, the evidence indicates that the Veteran had injuries to the right 4th and 5th metacarpals prior to service. A May 2003 VA examination report shows the Veteran reported that he first fractured his right little finger at 14 years old when it was pinched in a dumpster. He indicated that he re-fractured it during SRT School maneuvers. The diagnosis included status post old fracture to his right hand. 

During the Veteran's last period of service, an August 2005 treatment record notes that the Veteran pinched the 4th fingertip on the right hand and the nail turned black and had to be removed. A December 2005 treatment record notes an additional injury to the right 3rd finger when it was smashed. In July 2006, a VA examination report shows he reported that prior to active service around age 14 or 15, he punched a fence and fractured his 4th and 5th metacarpals. He noted that while serving at Fort Bragg he got the hand smashed between a dresser and the floor and was given a splint. In addition while serving in Iraq he was setting up a 50-caliber machine gun, which slipped and fell on his hand crushing his ring finger. He indicated that the hand swelled up and he felt that he had reinjured his previous area of injury. X-ray of the right hand showed a possible old healed fracture of the mid diaphysis of the 5th metacarpal bone. He was diagnosed as having a reaggravation of right hand contusion.

The Veteran also injured his right ankle while walking on stairs in his full combat gear in December 2005 and was assessed as having an anterior talofibular ligament sprain. An MRI also showed a longitudinal tear of the peroneus brevis tendon. A July 2006 VA examination report (during his active duty service) shows the Veteran indicated that he would wear a brace every time he sprained his right ankle. X-ray examination of the right ankle showed no fracture, dislocation, or focal bony destruction. He was diagnosed as having a right ankle strain. A December 2006 VA treatment record (during his active duty service) shows the Veteran continued to complained of right ankle pain. In February 2009, a service treatment record notes the history of injury to the right ankle with continued complaints of instability in the right ankle.

With respect to the left knee disability, an x-ray of the left knee in May 2003 was normal. A July 2003 general VA examination report shows the Veteran complained of bilateral knee pain since high school, which he related to running. A December 2006 VA examination report notes that the Veteran complained of clicking and pain in his knee for several years but that an MRI of the knee showed no abnormalities and examination showed full range of motion. In February 2009, a service treatment record notes that the Veteran reported that his left knee pain started in March 2008 when he was driving home from West Point. An April 2009 treatment note shows the Veteran's complaints of increased left knee pain with an increase in grinding and popping sensation.

Regarding the back disability, after the Veteran's first two periods of service, he underwent a VA examination in May 2003, in which the Veteran reported injuring his back in a parachuting accident in 2001. He noted that he was not seen at the time but currently saw a chiropractor for back pain. The assessment was status post trauma to the back. X-ray examination of the lumbosacral spine showed both minimal curvature and straightening. During the Veteran's last period of service, a post-deployment physical shows complaints of back pain in August 2007. In January 2008 he was diagnosed as having lumbago. A February 2008 orthopedic consult shows the Veteran's complaints of ongoing back pain and assessment of chronic lumbosacral sprain. A March 2009 treatment record also shows an assessment of lumbago and thoracic back strain. The Veteran reported that he did not recall any specific injury to the back but just that it started to bother him.

Post-service records show the Veteran had a past medical history of low back pain. Most recently, in December 2014 the Veteran complained of chronic back pain for two years and wanted to get an MRI ordered. Physical examination of the back showed no midline vertebral tenderness, and full range of motion. He was assessed as having chronic back pain. X-rays of the thoracic spine were later noted to be negative in December 2014.

In spite of these records of injuries in service, there is no post-service medical evidence to determine whether he continues to suffer from the claimed disabilities, and the Veteran has not cooperated with VA's efforts to schedule him for VA examinations to address the etiology of any of the claimed disabilities, as noted above. 

The Veteran is competent to report his symptoms associated with his claimed disabilities, however the etiology of the disabilities on appeal are not readily apparent to a lay person and there is no evidence that he has the medical expertise to make this determination. He is not shown to be competent to determine the etiology of the claimed disabilities. Even medical experts rely on diagnostic tools to identify pertinent pathology. Thus, in this case, the Board finds that there is no competent medical evidence of record to indicate that the Veteran presently has any of the claimed disabilities on appeal.

For the reasons discussed above, the Board concludes that the Veteran does not meet the criteria for service connection for disabilities of the back, left knee, right ankle, and right hand/ finger. The benefit-of- the-doubt doctrine has been considered; however, as the preponderance of the evidence is against the claim, it is inapplicable in the instant appeal. 38 U.S.C.A § 5107(b); see also Gilbert, supra. 

III. Increased Ratings 

Disability evaluations are determined by the application of a schedule of ratings which is based on average impairment of earning capacity. 38 U.S.C.A. § 1155; 38 C.F.R. § 4.1. Separate diagnostic codes identify the various disabilities. Where there is a reasonable doubt as to the degree of disability, such doubt shall be resolved in favor of the claimant, and where there is a question as to which of two evaluations shall be applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria required for that rating. 38 C.F.R. §§ 3.102, 4.3, 4.7. In addition, the Board will consider the potential application of the various other provisions of 38 C.F.R., Parts 3 and 4, whether or not they were raised by the veteran, as well as the entire history of the veteran's disorder in reaching its decision, as required by Schafrath v. Derwinski, 1 Vet. App. 589 (1991).

In a claim for a greater original rating after an initial award of service connection, all of the evidence submitted in support of the veteran's claim is to be considered. See Fenderson v. West, 12 Vet. App. 119 (1999); 38 C.F.R. § 4.2. Separate ratings can be assigned for separate periods of time based on the facts found, a practice known as "staged" ratings. See Hart v. Mansfield, 21 Vet. App. 505 (2007). Once the evidence is assembled, the Secretary is responsible for determining whether the preponderance of the evidence is against the claim. See Gilbert v. Derwinski, 1 Vet. App. 49, 55 (1990). If so, the claim is denied; if the evidence is in support of the claim or is in equal balance, the claim is allowed. Id.

When evaluating joint disabilities rated on the basis of limitation of motion, VA must consider granting a higher rating in cases in which functional loss due to pain, weakness, excess fatigability, or incoordination is demonstrated, and those factors are not contemplated in the relevant rating criteria. See 38 C.F.R. §§ 4.40, 4.45, 4.59; DeLuca v. Brown, 8 Vet. App. 202 (1995). 

The Court clarified that although pain may be a cause or manifestation of functional loss, limitation of motion due to pain is not necessarily rated at the same level as functional loss where motion is impeded. See Mitchell v. Shinseki, 25 Vet. App. 32, 38-43 (2011); cf. Powell v. West, 13 Vet. App. 31, 34 (1999); Hicks v. Brown, 8 Vet. App. 417, 421 (1995); Schafrath, 1 Vet. App. at 592. Instead, the Mitchell Court explained that pursuant to 38 C.F.R. §§ 4.40 and 4.45, the possible manifestations of functional loss include decreased or abnormal excursion, strength, speed, coordination, or endurance (38 C.F.R. § 4.40), as well as less or more movement than is normal, weakened movement, excess fatigability, and pain on movement (as well as swelling, deformity, and atrophy) that affects stability, standing, and weight-bearing (38 C.F.R. § 4.45). Thus, functional loss caused by pain must be rated at the same level as if the functional loss were caused by any of the other factors cited above. Therefore, in evaluating the severity of a joint disability, VA must determine the overall functional impairment due to these factors.

The provisions of 38 C.F.R. § 4.59, which relate to painful motion, are not limited to arthritis and must be considered when raised by the claimant or when reasonably raised by the record. Burton v. Shinseki, 25 Vet. App. 1 (2011). 

Where the record does not adequately reveal the current state of the claimant's disability, fulfillment of the statutory duty to assist requires a thorough and contemporaneous medical examination, particularly if there is no medical evidence which adequately addresses level of impairment of the disability since the previous examination. See e.g. Allday v. Brown, 7 Vet. App. 517, 526-27 (1995). The Veteran has claimed over the course of this appeal that his disabilities are more severely disabling than currently rated. The Veteran's own contentions require additional medical examination to address the level of impairment.

Since the Veteran failed to appear to his scheduled examinations in January 2015 without offering any explanation for his failure to cooperate, the Board has no alternative but to evaluate the claims for increase based on the evidence of record, which does not support a higher rating for the service-connected shoulder disabilities. See 38 C.F.R. § 3.655(b).

A. Bilateral Shoulder Disabilities

The Veteran's left shoulder disability is rated as 20 percent disabling under 38 C.F.R. § 4.71a, Diagnostic Code 5202 (other impairment of the humerus). This diagnostic code provides a series of disability ratings for the major (or dominant) and minor (or non-dominant) sides of the body. Handedness for the purpose of a dominant rating will be determined by the evidence of record, or by testing on VA examination. Only one hand shall be considered dominant. The injured hand, or the most severely injured hand, of an ambidextrous individual will be considered the dominant hand for rating purposes. 38 C.F.R. § 4.69. A July 2006 VA examination report notes that the Veteran is right-hand dominant. In that regard, Diagnostic Code 5202 (addressing the left shoulder) provides a minimum rating of 20 percent for malunion of the humerus with marked or moderate deformity on the minor side; or recurrent dislocation of the humerus at the scapulohumeral joint with frequent or infrequent episodes and guarding of either all arm movements, or movement only at shoulder level on the minor side. In order to receive the next higher 40 percent rating for impairment of the humerus on the minor side, the evidence must show fibrous union of the humerus. A 50 percent rating is assigned for nonunion of the humerus (false flail joint) on the minor side. A 70 percent rating is assigned for loss of head of (flail shoulder) of the humerus on the minor side.

The Veteran's right shoulder disability is rated as 10 percent disabling under 38 C.F.R. § 4.71a , Diagnostic Code 5024 (tenosynovitis). Diseases rated under Diagnostic Code 5024 will be rated on limitation of motion of affected parts, as arthritis, degenerative. Under Diagnostic Code 5003, degenerative arthritis established by x-ray findings will be rated on the basis of limitation of motion under the appropriate diagnostic codes for the specific joint or joints involved (DC 5200 etc.). When, however, the limitation of motion of the specific joint or joints involved is noncompensable under the appropriate diagnostic codes, a rating of 10 percent is for application for each such major joint or group of minor joints affected by limitation of motion, to be combined, not added under diagnostic code 5003. Limitation of motion must be objectively confirmed by findings such as swelling, muscle spasm, or satisfactory evidence of painful motion. 

Normal forward flexion of the shoulder is 0 to 180 degrees; abduction is 0 to 180 degrees; and internal and external rotation is from 0 to 90 degrees. 38 C.F.R. § 4.71a , Plate I. Forward flexion and abduction to 90 degrees amounts to shoulder level.

Diagnostic Code 5201 provides a minimum 20 percent rating for limitation of motion of the major arm at the shoulder level. See 38 C.F.R. § 4.71a, DC 5201. A 30 percent rating is assigned for limitation of motion of the arm midway between the side and shoulder level on the major side. A maximum 40 percent rating is assigned for limitation of motion to 25 degrees on the major side. Id.

Service treatment records show the Veteran complained of right shoulder pain and was assessed as having a right rhomboid trigger point secondary to wearing interceptor body army while serving in Iraq in January 2006. A July 2006 VA examination report shows flexion (forward elevation) in the right shoulder from 0 to 180 degrees, and abduction from 0 to 150 degrees, with no additional limitation of motion on repetitive use.

A March 2008 treatment record notes that the Veteran reported falling down stairs and injuring his right shoulder in December 2006. An MRI performed in August 2007 reportedly confirmed a labral tear and an arthroscopic anterior and posterior repair was performed in November 2007. He complained of sharp pain with certain movements. Regarding the left shoulder, the Veteran denied any specific incident or trauma but indicated that he could have injured the left shoulder when his right shoulder was in a sling and he reached to prevent his daughter from falling. He complained of "subluxation" in the left shoulder. Physical examination of the shoulders showed forward elevation to 160 degrees on the right side and 180 on the left. His abduction on the right was to 150. Range of motion in the left shoulder was "good."

A July 2008 treatment record shows right and left shoulder flexion to 130 degrees and abduction to 100 degrees. A later July 2008 treatment record shows the right shoulder had flexion to 160 degrees and abduction to 145 degrees. The left shoulder had flexion to 150 degrees and abduction to 120 degrees. An August 2008 medical record report shows diagnoses that include left shoulder pain, status post left posterior labral tear repair, and partial right shoulder subluxation and pain. In September 2008, a treatment record notes that the Veteran reportedly underwent a right shoulder surgery in October 2007 and rotator cuff repair in April 2008. He indicated that he fell onto his right side injuring his right shoulder and then tore his rotator cuff on the left side from overuse while compensating for the right shoulder while it was healing. Physical examination showed right shoulder forward flexion to 175 degrees and abduction to 165 degrees. Left shoulder flexion was to 160 degrees, and abduction to 155 degrees.

After service, a November 2010 VA examination report shows right shoulder forward flexion and abduction to 135 degrees with no additional loss of motion after repetitive use. The left shoulder had forward flexion and abduction to about 100 to 110 degrees with pain, with no additional loss of motion after repetitive use. The Veteran also had complaints of instability in the shoulders. A January 2011 VA primary care note shows the Veteran's complaints of his shoulders "subluxating" and being painful.

Additional VA treatment records dated through December 2014 reference chronic bilateral shoulder pain status post bilateral shoulder surgeries in passing but do not include any specific assessment of the Veteran's bilateral shoulder disabilities. An August 2012 VA treatment record noted full range of motion in all joints without evidence of erythema, effusion, or warmth.

These findings demonstrate that a rating higher than 20 percent is not warranted for the left shoulder disability under Diagnostic Code 5202, as there is no indication of nonunion of the humerus (false flail joint) or loss of head of (flail shoulder) of the humerus. In addition, a rating higher than 20 percent under Diagnostic Code 5201 for limitation of motion also does not apply for the left shoulder, as the left shoulder forward flexion and abduction are most severely limited to 100 degrees, as noted in November 2010, with no additional loss of motion after repetitive use. A higher rating of 30 percent on the minor side under Diagnostic Code 5201 does not apply unless the arm is limited in motion to 25 degrees from side, which is not shown in the available medical records.

A rating higher than 10 percent also is not warranted for the right shoulder disability under Diagnostic Code 5201. The right shoulder was most severely limited to 135 degrees of flexion and abduction, as noted in November 2010, with no additional loss of motion after repetitive use. During his military service, right shoulder flexion abduction was even further limited to 100 degrees in July 2008. However, none of these findings demonstrate right shoulder movement being limited to shoulder level (i.e., at 90 degrees), which is necessary in order to get a 20 percent rating for limitation of motion of the major side under Diagnostic Code 5201. 

These limitations also consider pain, and signify where the painful motion started for the Veteran. It was noted on examination in 2010 that repetitive motion did not result in any additional limitations in motion. No additional compensation for functional loss resulting from factors addressed in 38 C.F.R. §§ 4.40, 4.45 and DeLuca, 8 Vet. App. 202, 204-07 (1995) is warranted, as functional impairment due to pain has been addressed by the 20 percent rating assigned. See also Mitchell v. Shinseki, 25 Vet. App. 32, 43 (2011) (Pain that affects some aspect of "the normal working movements of the body" such as "excursion, strength, speed, coordination, and endurance," constitutes functional loss.). 

None of the other rating criteria under 38 C.F.R. § 4.71a pertaining to the shoulder and arm apply. With respect to the right shoulder, while the Veteran has complaints of instability of the right shoulder, the medical evidence does not show impairment of the clavicle or scapula resulting in malunion, nonunion, or dislocation, as contemplated under DC 5203. There also is no evidence of impairment of the humerus on the right side including malunion, frequent episodes of recurrent dislocation, fibrous union, nonunion, or loss of head of humerus (flail shoulder), as addressed by DC 5202. While the record shows a history of instability and subluxating in the right shoulder during service and surgery to repair the right shoulder impairment, post-service medical evidence does not demonstrate any of the criteria for a rating higher than 10 percent including under the diagnostic criteria pertaining to impairment of the humerus under Diagnostic Code 5202. Additionally, with respect to both shoulders, there is no ankylosis of the scapulohumeral articulation, as considered by DC 5200. 

The Veteran genuinely believes that he is entitled to an increased rating for his bilateral shoulder disabilities. His factual recitation as to symptomatology associated with the shoulders is accepted as true. However, as a layperson, lacking in medical training and expertise, the Veteran cannot provide a competent opinion on a matter as complex as the present severity of his shoulder disabilities, and his views are far outweighed by the detailed opinions provided by the medical professionals who examined the Veteran's shoulders and discussed all relevant details for purposes of rating his disability. See Jandreau v. Nicholson, 492 F.3d 1372 (Fed. Cir. 2007); Buchanan v. Nicholson, 451 F.3d 1331 (Fed. Cir. 2006).

For all the foregoing reasons, the Board finds that a rating in excess of 20 percent is not warranted for the left shoulder disability, or in excess of 10 percent for the right shoulder disability. There are no objective medical findings that would support the assignment of a higher rating. See Hart v. Mansfield, 21 Vet. App. 505 (2007). 

B. Bilateral Hearing Loss

As noted in the introduction, the RO granted service connection for bilateral hearing loss in a December 2009 rating decision, assigning a 0 percent rating, effective April 28, 2009. The Veteran seeks entitlement to a higher disability rating.

The Veteran's hearing loss has been evaluated under 38 C.F.R. § 4.85, DC 6100 (2014). This diagnostic code sets out the criteria for evaluating hearing impairment using pure tone threshold averages and speech discrimination scores. Numeric designations are assigned based upon a mechanical use of tables found in 38 C.F.R. § 4.85; there is no room for subjective interpretation. See Acevedo-Escobar v. West, 12 Vet. App. 9, 10 (1998); Lendenmann v. Principi, 3 Vet. App. 345, 349 (1992).

Audiometric results are matched against Table VI to find the numeric designation, then the designations are matched with Table VII to find the percentage evaluation to be assigned for the hearing impairment. To evaluate the degree of disability for service-connected hearing loss, the Rating Schedule establishes 11 auditory acuity levels, designated from level I for essentially normal acuity, through level XI for profound deafness. 38 C.F.R. § 4.85. When impaired hearing is service connected in one ear only, the non- service-connected ear will be assigned a designation of level I from Table VII. 38 C.F.R. § 4.85(f).

The provisions of section 4.86 address exceptional patterns of hearing loss, which are defined as when each of the puretone thresholds at 1000, 2000, 3000, and 4000 hertz (Hz) are 55 decibels or more, or when the puretone threshold is 30 decibels or less at 1000 Hz and 70 decibels or more at 2000 Hz. 38 C.F.R. § 4.86.


On authorized VA audiological evaluation in June 2006 (during the Veteran's military service), puretone thresholds, in decibels, were as follows:




HERTZ



1000
2000
3000
4000
Average
RIGHT
10
0
15
55
20
LEFT
10
0
40
45
24

Speech audiometry revealed speech recognition ability of 96 percent in the right ear and 100 percent in the left ear. The Veteran reported that his exposure to a series of mortar launches in Iraq caused significant temporary loss of hearing for conversational speech. 

The results of the June 2006 audiogram show an average puretone threshold of 20 decibels in the right ear with speech recognition ability of 96 percent rating; and an average puretone threshold of 24 decibels in the left ear with speech recognition ability of 100 percent. Exceptional patterns of hearing loss are not shown, pursuant to 38 C.F.R. § 4.86(a), as each of the puretone thresholds at 1000, 2000, 3000, and 4000 hertz (Hz) is not 55 decibels or more; nor is puretone threshold at 30 dB at 1000 Hz and 70 dB at 2000 Hz. Table VI indicates a numeric designation of I for the right and left ears. The point of intersection on Table VII reflects the level of hearing loss is consistent with a 0 percent evaluation.

On the authorized VA audiological evaluation in November 2009, puretone thresholds, in decibels, were as follows:




HERTZ



1000
2000
3000
4000
Average
RIGHT
5 
5
15
50
19
LEFT
5
0
35
55
24

Speech audiometry revealed speech recognition ability of 96 percent in both ears. The Veteran reported difficulty hearing at a distance and in noisy environments. 

The results of the November 2009 audiogram show an average puretone threshold of 19 decibels in the right ear with speech recognition of 96 percent, and 24 decibels in the left ear with speech recognition ability of 96 percent. Once again, exceptional patterns of hearing loss are not shown, pursuant to 38 C.F.R. § 4.86(a). Table I indicates a numeric designation of I for both ears. The point of intersection on Table VII reflects the level of hearing loss is consistent with a 0 percent evaluation.

On the authorized VA audiological evaluation in December 2010, puretone thresholds, in decibels, were as follows:




HERTZ



1000
2000
3000
4000
Average
RIGHT
10
0
10
50
18
LEFT
10
0
35
55
25

Speech audiometry revealed speech recognition ability of 98 percent in the right ear and 100 percent in the left ear. The Veteran reported an increased difficulty in hearing and aural fullness.

The results of the December 2010 audiogram show an average puretone threshold of 18 decibels in the right ear with speech recognition of 98 percent, and 25 decibels in the left ear with speech recognition ability of 100 percent. Exceptional patterns of hearing loss are not shown, pursuant to 38 C.F.R. § 4.86(a). Table I indicates a numeric designation of I for both ears. The point of intersection on Table VII reflects the level of hearing loss is consistent with a 0 percent evaluation.

The Veteran asserts that he is entitled to a higher rating for his hearing loss disability. As evidenced above, however, notwithstanding the Veteran's complaints, the audiograms did not show a level of hearing loss warranting a rating higher than 0 percent. To the extent that his hearing is impaired, the fact that the Veteran's hearing acuity is less than optimal does not by itself establish entitlement to a higher disability rating. To the contrary, it is clear from the Rating Schedule that a higher rating can be awarded only when loss of hearing has reached a specified measurable level. The medical evidence does not support the assignment of a rating higher than 0 percent for the hearing loss during the entire appeals period. To the extent that the Veteran asserts entitlement to a higher rating for his hearing loss, while the Board acknowledges the Veteran's complaints, entitlement to an evaluation in excess of the ratings assigned has not been demonstrated in the present case. See Hart v. Mansfield, 21 Vet. App. 505 (2007).

For all the foregoing reasons, the Board finds that the evidence does not support the assignment of a rating in excess of 0 percent for hearing loss. Therefore, entitlement to an increased rating for the impairment associated with bilateral hearing loss is not warranted. 

To the extent that the Veteran has contended that his hearing loss is more severely impaired than the rating assigned, the preponderance of the evidence is against the claim; and the benefit of the doubt doctrine is not applicable. See Gilbert v. Derwinski, 1 Vet. App. 49 (1990). 

IV. Extraschedular Consideration

The rating schedule represents as far as is practicable, the average impairment of earning capacity. Ratings will generally be based on average impairment. See 38 C.F.R. § 3.321(a), (b) (2013). To afford justice in exceptional situations, an extraschedular rating can be provided. See 38 C.F.R. § 3.321(b). 

The Court clarified the analytical steps necessary to determine whether referral for extraschedular consideration is warranted in Thun v. Peake, 22 Vet. App. 111 (2008). First, the RO or the Board must determine whether the evidence presents such an exceptional disability picture that the available schedular evaluations for that service-connected disability are inadequate. Second, if the schedular evaluation does not contemplate the veteran's level of disability and symptomatology and is found inadequate, the RO or Board must determine whether the claimant's exceptional disability picture exhibits other related factors such as those provided by the regulation as "governing norms." Third, if the rating schedule is inadequate to evaluate a veteran's disability picture and that picture has attendant thereto related factors such as marked interference with employment or frequent periods of hospitalization, then the case must be referred to the Under Secretary for Benefits or the Director of the C&P Service to determine whether, to accord justice, the veteran's disability picture requires the assignment of an extraschedular rating. 

The Veteran's shoulder disabilities cause functional impairment due to pain, instability, and limitation of motion. None of these factors, however, denote an exceptional or unusual disability picture. The symptoms associated with the Veteran's hearing loss (i.e., difficulty hearing at a distance and understanding speech in the presence of background noise) also are not shown to cause any impairment that is not already contemplated by the rating criteria. 

As the symptoms associated with the Veteran's disabilities are not shown to cause any impairment that is not already contemplated by the rating criteria, referral for consideration of an extraschedular rating is not warranted for this claim. 

ORDER

Entitlement to service connection for residuals of traumatic brain injury is granted.

Entitlement to service connection for residuals of a right hand contusion is denied.

Entitlement to service connection for a left knee disability is denied.

Entitlement to service connection for a right ankle disability is denied.

Entitlement to service connection for a back disability is denied.

Entitlement to a rating higher than 10 percent for a right shoulder disability is denied.

Entitlement to a rating higher than 20 percent for a left shoulder disability is denied. 

Entitlement to a rating higher than 0 percent for bilateral hearing loss is denied.
REMAND

During the course of the remand for the other issues on appeal, the Veteran appealed the rating assigned for narcolepsy/ sleep paralysis of 20 percent, and denial of special monthly compensation for aid and attendance of another person. He requested a Board videoconference hearing with respect to both claims. It does not appear that a hearing has yet been scheduled so these claims must be remanded.

Accordingly, the case is REMANDED for the following action:

Schedule the Veteran for the next available Board video conference or Travel Board hearing at his local VA Regional Office as soon as practicable with respect to his claim for an initial rating higher than 20 percent for narcolepsy/ sleep paralysis and SMC based on aid and attendance of another person. Both he and his representative should be notified of the date, time, and location of the hearing.

The appellant has the right to submit additional evidence and argument on the matter or matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).



______________________________________________
S. L. Kennedy
Veterans Law Judge, Board of Veterans' Appeals

Department of Veterans Affairs